No. 23-6207

_____

IN THE UNITED STATES DISTRICT COURT OF APPEALS

FOR THE TENTH CIRCUIT

_____


UNITED STATES OF AMERICA

Plaintiff - Appellee

V.

JOSEPH MALDONADO – PASSAGE

Defendant – Appellant

_____

On Appeal From The United States District Court

For The Western District of Oklahoma

_____

**OPENING BRIEF OF APPELLANT MALDONADO-PASSAGE**

Roger Roots
John Pierce Law, P.C.
113 Lake Drive East
Livingston, MT 59047
(406) 222-4965  Cell:  (775) 764-9347
rroots@johnpiercelaw.com
*Counsel for Petitioner Joseph Maldonado-
Passage a/k/a Maldonado a/k/a Joe Exotic*

# TABLE OF CONTENTS

TABLE OF CONTENTS…………………………………………………………..2

TABLE OF AUTHORITIES……………………………………………………….3

STATEMENT OF RELATED CASES…………………………………………….7

JURISDICTIONAL STATEMENT………………………………………………..7

ISSUES PRESENTED FOR REVIEW……………………………………………7

STATEMENT OF THE CASE……………………………………………………7

STANDARD OF REVIEW………………………………………………………24

SUMMARY OF THE ARGUMENT……………………………………………..24

ARGUMENT……………………………………………………………………..26

   I.    THE DISTRICT COURT APPLIED THE WRONG STANDARD FOR CONSIDERING A MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE WHICH INCLUDES RECANTATIONS AND PERJURY……………………………………………….....…26

   II.   MALDONADO FILED AN EXTREMELY DETAILED MOTION SUPPORTED BY OVERWHELMING EVIDENCE; BUT THE DISTRICT COURT ERRONEOUSLY CONSTRUED THIS MASSIVE WEIGHT AS "BURIED TRUFFLES."………………………….…..32

   III.  THE DISTRICT COURT WRONGLY DENIED AN EVIDENTIARY HEARING……………………………………………………....34

   IV.  THE NEWLY DISCOVERED EVIDENCE REGARDING THE ILL HEALTH OF THE BURIED TIGERS PROVES MALDONADO WAS WRONGLY CONVICTED OF COUNTS 3-7…………………………40

   V.   NEW REVELATIONS OF UNDISCLOSED IMMUNITY DEALS BETWEEN THE GOVERNMENT AND ITS WITNESSES………….46

   VI.  THE NEWLY DISCOVERED EVIDENCE PUTS "THE MOST DAMNING EVIDENCE AGAINST" MALDONADO IN PLAIN CONTEXT………………………………………………………...57

   VII.

CONCLUSION……………………………………………………….......64

CERTIFICATE OF COMPLIANCE…………………………………………...65

CERTIFICATE OF SERVICE……………………………………………………66

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Berry v. Georgia*,
    10 Ga. 511 (1851)……………………………………………………...….26

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384, 405 (1990)………………………………………….......32

*Damaj v. Farmers Ins. Co., Inc.*,
    132 F.3d 42 (10th Cir. 1993)…………………………………….....43

*Delaney v. State*,
    51 S.W.2d 485 (Tenn. 1932)…………………………………………..58

*Douglas v. Workman*,
    560 F.3d 1156 (10th Cir. 2009)…………………………………….....55

*Giglio v. United States*,
    405 U.S. 150, 150–55 (1972)………………………………………31, 51, 53

*Gilday v. Callahan*,
    59 F.3d 257 (1st Cir. 1995)………………………………………..….36

*Grisby v. Blodgett*,

130 F.3d 365 (9th Cir. 1997)……………………………………...…39, 56

*Harris v. Lafler*,

553 F.3d 1028 (6th Cir. 2009)……………………………………...36

*Hayes v. Brown*,

399 F.3d 972 (9th Cir. 2005)……………………………………………36

*Jackson v. Duckworth*,

955 F.2d 21, 22 (7th Cir. 1992)……………………………………...43, 44

*Johnson v. Sheriff, Clark County*,

532 P.2d 1037, 1038 (Nev. 1975)………………………………….………58

*Kyles v. Whitley*,

514 U.S. 419 (1995)…………………………………………………31, 32

*Larrison v. United States*,

24 F.2d 82 (7th Cir. 1928)……………………………………………28, 29, 30

*Logan v. District of Columbia*,

447 F. Supp. 1328, 1330-1331 (D.D.C. 1978)………………...……...…59

*Martin v. United States*,

889 F.3d 827, 833 (6th Cir. 2018)……………………………………36

*Mathews v. United States*,

485 U.S. 58, 63 (1988)………………………………………………...…62

*Music Research, Inc. v. Vanguard Recording Soc'y*,

547 F.2d 192 (2d Cir. 1976)……………………………………...……24

*Napue v. Illinois*,

360 U.S. 261 (1959)……………………………………………………..31

*Phillips v. Ornoski*,

673 F.3d 1168 (9th Cir. 2012)……………………………………….36

*Schledwitz v. United States*,

    169 F.3d 1003 (6th Cir. 1999)………………………………………..…63

*Spanish Action Comm. v. City of Chicago*,

    766 F.2d 315, 321 (7th Cir. 1985)………………………………….…24

*United States v. Bagley*,

    473 U.S. 667, 678 (1985)………………………………………….……..25


*United States v. Boyd*,

    55 F.3d 239 (7th Cir. 1995)…………………………………….……..63

*United States v. Bradshaw*,

    787 F. 2d 1385, 1391 (10th Cir. 1986)……………………………..34

*United States v. Briola*,

    465 F.2d 1018 (10th Cir. 1972), Cert. denied, 409 U.S. 1108 (1973)……..29

*United States v. Dunkel*,

    927 F.2d 955, 956 (7th Cir. 1991)………………………….………33

*United States v. Gregory*,

    983 F.2d 1069 (6th Cir. 1992)………………………………………...45

*United States v. Jackson*,

    579 F.2d 553, 554–61 (10th Cir. 1978)………………………………28

*United States v. Jordan*,

    806 F.3d 1244 (10th Cir. 2015)……………………………….…..27, 29

*United States v. Kelly*,

    748 F.2d 691, 698 (D.C. Cir. 1984)………………………………….63

*United States v Krasny*,

    607 F2d 840 (9th Cir. 1979)…………………………………….……..30

*United States v. McCullough,*

    457 F. 3d 1150, 1167 (10th Cir. 2006)…………………………...…24

*United States v. Minsky,*

    963 F.2d 870 (6th Cir. 1992)………………………………...…..63

*United States v. Morris*,

    498 F.3d 634 (7th Cir. 2007)…………………………………….56

*United States v. Olano*,

    507 U.S. 725, 736 (1993)………………………………………..37

*United States v. Page*,

    828 F. 2d 1476, 1478 (10th Cir. 1987)……………………..…….34

*United States v. Pearson*,

    203 F.3d 1243, 1274–75 (10th Cir. 2000)…………………………34

*United States v. Pelullo*,

    105 F.3d 117 (3d Cir. 1997)…………………………………….45

*United States v. Rojas*,

    520 F.3d 876, 884-85 (8th Cir. 2008)………………………...…38

*United States v. Salem*,

    578 F.3d 682, 686-88 (7th Cir. 2009)…………………………...…38

*United States v. Sanchez-Sotelo*,

    8 F.3d 202, 212-13 (5th Cir. 1993)……………………….……..38

*United States v. Smith*,

    77 F.3d 511 (D.C. Cir. 1996)…………………………………...56

*White Motor Corp. v. Stewart*,

    465 F.2d 1085, 1090 (10th Cir.) *cert. denied*, (1972)……………….……24

**Statutes, Rules, & Regulations**

Fed. R. Civ. P. 56(c)………………………………………...………………….……44


**Other Authorities**

59 A.L.R. Fed. 657 (1982)…………………………………………………...…28

94 A.L.R. Fed. 60 (1989)…………………………………………….…........28

## STATEMENT OF RELATED CASES

There are no prior or related cases.

## JURISDICTIONAL STATEMENT

This is appeal from a denial of a motion for new trial. The district court had

jurisdiction under Fed. R. Crim. Proc. 33 (b)(1).  This Court has appellate

jurisdiction under 28 U.S.C. § 1291.  On December 5, 2023, Maldonado filed a

notice of appeal from the final judgment entered on November 21, 2023.  The

appeal was timely under Federal Rule of Appellate Procedure 4(a)(1)(A).

## ISSUES PRESENTED FOR REVIEW

The issues in this appeal are:

1.  Did the District Court apply the correct standard for reviewing a

    motion for new trial based on newly discovered evidence?

2.  Did the District Court err in failing to hold an evidentiary hearing?

3.  Did the District Court err regarding its other assessments of the

    Motion for New Trial?

STATEMENT OF THE ISSUES PRESENTED AND APPLICABLE
STANDARD OF REVIEW.

1.     Did the District Court apply the correct standard for reviewing a

motion for new trial based on newly discovered evidence?

2.     Did the District Court err in failing to hold an evidentiary hearing?

3.     Did the District Court err regarding its other assessments of the

Motion for New Trial?

## STANDARD OF REVIEW

The denial of a motion for new trial based on newly discovered evidence is

reviewed for an abuse of discretion. *United States v. McCullough*, 457 F. 3d 1150,

1167 (10th Cir. 2006).

## STATEMENT OF JURISDICTION

This is appeal from a denial of a motion for new trial. The district court had

jurisdiction under (Fed. R. Crim. Proc. 33 (b)(1)). Notice of appeal was filed on

December 5, 2023. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE CASE

This is an appeal of a district court order ("Order") denying a motion for

new trial by Appellant Joseph Maldonado-Passage ("Maldonado"). In support of

his motion, Maldonado provided newly discovered evidence that Maldonado's trial

was riddled with false evidence.

Maldonado, the "Tiger King" of reality TV, was once the largest private owner of tigers in the world. Now he is serving a 21-year prison sentence, convicted of two counts of murder for hire, nine counts of violating the Endangered Species Act, and nine counts for violations of the Lacey Act.

Maldonado's murder for hire convictions (and the reality TV series) involved claims that Maldonado plotted to kill rival tiger keeper Carole Baskin, the operator of "Big Cat Rescue" in the Tampa, Florida area.

Among exotic animal exhibitors, Carole Baskin was likely the most hated person in the world. Baskin spent years, in coordination with government agencies and PETA, in well-funded crusades to shut down facilities and abolish private zoos, circuses, and ownership of big cats. Ms. Baskin had organized messaging efforts aimed at fairs, family events, films, circuses, entertainment productions, and shopping malls, to cancel animal exhibitions. (Note that after Maldonado's trial, Ms. Baskin was successful in having Congress ban private ownership of big cats as pets).

Ms. Baskin's lawfare included serial filings of complaints against exhibitors such as Maldonado, as well as spying and sabotage operations. Maldonado, like many big cat owners (including other players in this case, James Garretson and Jeff Lowe), had been the recipient of complaints by Ms. Baskin's network. And in

2016, Ms. Baskin had obtained a $1 million trademark infringement judgment against Maldonado. Ms. Baskin had also sued Jeff Lowe, who purchased Maldonado's Greater Wynnewood Animal Park.

The animosity between Maldonado and Carole Baskin was undeniably real. *But by all accounts, some of this animosity was accentuated for dramatic effect.* In fact most of the important non-governmental witnesses in Maldonado's case *were paid for their roles* by *Tiger King*'s producers.

### The "Plot."

The murder for hire plot(s) alleged by the government were straightforward. Maldonado was said (in Count 1) to have approached zoo worker Alan Glover because Glover had a "teardrop" tattoo on his face, and offered to send Glover across state lines, first to Texas, to obtain fake ID with which to board a bus under alias (thus satisfying the statute's "facilities in interstate commerce" element). Then, supposedly, Maldonado offered Glover thousands of dollars in untraceable cash to send Glover from Oklahoma to Florida to assassinate Baskin.

A subplot was that Maldonado supposedly demanded Glover's cell phone, to mail it to business partner Jeff Lowe in Las Vegas where Lowe would 'ping' the location as an alibi for Glover. In exchange, Maldonado supposedly provided an untraceable phone to Glover. The 'burner phone' was said to be pre-loaded by

Maldonado with pictures to identify Carole Baskin. The plan was supposedly for Glover to attack Baskin on a bike path—supposedly another idea of Maldonado's.

Almost none of these things happened.  Although Glover did receive $3,000 *via* Maldonado; Glover *flew commercially*, using *his own ID*, home to *South Carolina*. Maldonado then sought out a better 'hit man.'  Count 2 alleged Maldonado hired "Mark," an undercover FBI agent, to kill Baskin.  "Mark" had been introduced to Maldonado by another business partner, James Garretson—supposedly at Maldonado's request.

Although secret recordings seem to abound in this case, none of the alleged acts by Maldonado were ever recorded. Rather, Maldonado was surreptitiously recorded *discussing* various components of these themes.

Although the indictment first charged Maldonado with only the murder for hire cases, the government later added numerous felonies relating to exotic animal treatment and transactions.

### Glover's Crucial Testimony Guided by Leading Questions.

At trial, Glover identified himself as Maldonado's "hired hit man," almost entirely by answering the prosecution's *leading questions,* in plain violation of Rule 611 of the Federal Rules of Evidence:

Q. (Ms. Maxfield-Green) At the time that you were telling Mr. Garretson all that, did you plan on actually going to Florida to murder Carole Baskin?

A. No, ma'am.

Q. Now, you testified earlier that you had by that point – had convinced Mr. -- convinced Joe that you would kill Carole Baskin. Were those conversations that you had with Joe similar to that one that you had with Mr. Garretson?

A. Yes, ma'am, sometime.

Q. Okay. So at some point after you got the fake ID did Mr. Passage give you money, as you had discussed, to go to Florida to kill Carole Baskin?

A. Yes, ma'am.

Tr. Trans. P. 636 (testimony of Glover).

Q. Around this same time, did you book an airplane ticket to leave Oklahoma?

A. Yes, ma'am.

Q. Where were you going to fly to?

A. To Savannah, Georgia.

Q. Now, had you discussed with Joe that you wanted to go to South Carolina first?

A. Yes, ma'am.

Q. And was he -- did he agree to that plan?

A. He didn't care, as long as I got to Florida.

Q. Did you tell him that you would go to Florida after you got to South Carolina?

A. Yes, ma'am.

Tr. Trans. 639 (Glover testimony).

Q. Okay. So at this point you -- Joe had given you money and a new cell phone. And then did you, in fact, take that flight to South Carolina?

A. Yes, ma'am, I did.

Q. And did you fly out of Oklahoma City?

A. Yes, ma'am.

Tr. Trans. 643 (direct testimony of Alan Glover).

Maldonado's counsel did not object to these leading questions, perhaps to highlight the manipulative examination for the jury. Again and again, the prosecutor stated propositions which Glover would then agree to.

Q. Okay. Mr. Glover, after you made it to South Carolina, did you ever, in fact, go to Florida?

A. Yes, ma'am, I did.

Q. About how long after you got to South Carolina did you go to Florida?

A. Couple of weeks maybe. I'm not -- I'm not sure 100 percent on that, ma'am.

Q. How did you get there?

A. Took a vehicle.

Tr. Trans. P. 644-45.

At times the prosecutor seemed to even try to lead Glover to give answers that would excuse Glover's imprecision and lack of clarity regarding central facts:

Q. Did you have a driver's license at that time?

A. No, ma'am.

Q. Did you take a phone with you?

A. No, I did not.

Q. Did you take the money that Joe had given you?

A. Oh, yeah. Yes, ma'am.

**Q. Mr. Glover, before you left for Florida, when you got in the car, were you drinking alcohol?**

A. Yes, ma'am.

Q. How much alcohol?

A. Probably too much to be driving.

**Q. Were you using drugs as well?**

A. Painkillers, cocaine.

**Q. So on the way driving from South Carolina to Florida, were you drunk?**

A. Pretty much, yes, ma'am.

**Q. And were you high?**

A. Yes, ma'am.

Tr. Trans. P. 645.

For his part, Maldonado testified at trial that he handed Glover $3,000 as a loan, *from the zoo's night deposits* (and thus from Jeff Lowe, who owned the zoo), *at Lowe's direction*; to get the troublesome Glover out of the hair of the zoo

operation.[1] He said Glover told him to mail Glover's phone to Jeff Lowe in Vegas

at Lowe's direction.[2]

---

[1] "Jeff said, give him three -- I mean, at that time I was texting

> He wanted to go home. *So Jeff calls me and says, give Alan $3,000 so he can get his ass back to South Carolina and get his legal mess cleaned up, and he'll be out of your hair."*

> I was directed by Jeff to give him 3,000 bucks to go home so he had traveling money and living money because Jeff had retail stores out in the east coast and he was going to go work for Jeff out there.

> Q. All right. So where did the money come from that you gave to Glover?

> A. Out of the night deposits, just like Jeff told me to take it out of the night deposits.

Tr. Trans. 1003-04 (Maldonado testimony).

9.
> After I gave Alan the money, a couple hours later he walks over into the office and he lays his cell phone on the desk, and to this day I swear it didn't have a charger. It was just a cell phone. And he says, here, we're supposed to mail this to Jeff. . . .
> Q. Was there any other discussion between you and Alan about this cell phone?
> A. No.
> Q. Any discussion with Jeff about this cell phone?
> A. No, sir.
> Q. Now, there was testimony from Mr. Glover that you gave him another cell phone.
> A. That was all a lie.
> Q. Did you give him another cell phone?
> A. Absolutely not, especially a company phone that we just advertised several thousand dollars to order pizza with.
> Q. So did you see a phone on the day that he was leaving town?
> A. No, sir.

The idea for getting fake ID for Glover also came from Garretson, according to Maldonado. Maldonado said Lowe and Garretson both constantly pestered him to get involved in discussions regarding Carole Baskin. Maldonado repeatedly put them off with excuses, delays, and by not following through with anything suggested.

Maldonado further testified that he "received a tip . . . that they were up to something." For this reason, Maldonado began "fishing" for information about what Lowe, Garretson, and Glover "were up to." "But they were -- they were like high-pressure salesmen trying to sell you a vacuum cleaner with extra parts. They just nonstop. It was all about Carole, Carole, Carole, Carole. Tr. Trans. 1003.

Maldonado said he delayed Garretson and Lowe with excuses; especially an excuse that he needed to sell a tiger cub to raise money. And, in fact, Garretson's secret recordings capture Maldonado speaking with detail about ideas for the murder plan—always, however, while supposedly awaiting for some future condition, such as an upcoming cub transaction. (Ironically, Maldonado's detailed excuses were later cited by the District Court as "overwhelming evidence" of Maldonado's guilt.)

> MALDONADO: And he says, well, I know a guy that can take care of it. **And -- and through this entire process -- you can watch these**

Tr. Trans. 1005 (Maldonado direct testimony).

**videos -- and every time I use the excuse I have to sell a cub or I ain't got no babies born, I ain't got no money. It was the easiest way to get rid of [Garretson]. . . .**

Q. Were those conversations that you started or was the topic brought up by Garretson?

A. It was always him calling. And I believe one of them in early December even -- I even lied to him and told him I had a photo shoot in Dallas to get out of even the conversation, but I was actually at a parade in Davis, Oklahoma.

Tr. 1011 (emphasis added).

### A Case of He-Said;-They-Said.

Federal prosecutors offered almost no cross-examination regarding the substance of Maldonado's defenses. Prosecutors merely asked Maldonado about *the likelihood that all his accusers were lying*. There were no questions regarding the ill health of the euthanized tigers. And the government asked few questions regarding his account that others initiated, led, and orchestrated all the murder for hire ideas. When Maldonado rested, the government *offered no rebuttal*.

It was a trial of he-said against they-said, despite massive investigatory spending, multiple undercover informants, surveillance, and numerous clandestine recordings. Conveniently for the government, there were no witnesses, and no recordings of Maldonado's supposed solicitation of Glover (or "Mark") to kill Baskin.

### The paperwork violations.

Maldonado's defense to the Lacy Act paperwork violations focused on practices in the industry. Maldonado held a USDA exhibitors license—the highest license for handling exotic animals. Others around him possessed lower-level licenses. Maldonado testified that the transfers were donations because he was transferring the animals onto others' licenses with no financial incentive to him.

### The Newly Discovered Evidence.

Almost immediately after Maldonado's trial verdict, questions circulated regarding the propriety of Maldonado's convictions. Witnesses came forward saying their testimony (or *silence*) was false or coerced. Attorney John Phillips launched a months-long investigation, tracking down witnesses. Most significantly, Phillips obtained the cell phones of the witnesses and analyzed their contents in conjunction with post-trial interviews.

The newly discovered evidence showed that almost every facet of the case presented against Maldonado at trial was exaggerated or false. In general, <u>the new evidence corroborated Maldonado's version of events</u>.

On April 1, 2022, Maldonado filed his 65-page Motion for New Trial, consisting of affidavits, texts and recorded calls. Maldonado requested an evidentiary hearing.

Maldonado's newly discovered evidence included affidavits from significant government witnesses admitting to perjury at trial (e.g., Glover affidavit, 1: "I committed perjury during my trial testimony regarding my involvement as the hitman in the murder for hire"). There were also *hundreds* of previously undisclosed phone recordings corroborating the witness's recantations and supporting Maldonado's trial testimony. Even the existence of the newly discovered texts and recordings by themselves *directly contradicted* witness testimony that all recordings were turned over at Maldonado's trial.[3]

These recantations pointed to government misconduct in failing to disclose Brady evidence. Moreover, these government witnesses state that "the government was aware" of the falsity of testimony at Maldonado's trial.

The new evidence refuted Garretson's testimony that Maldonado first proposed killing Carole Baskin on a bike path (the alleged modus operandi of the proposed hit). It was discovered that an undisclosed witness, Britney Medina, was present at the 'bike path meeting.' Medina states that Maldonado was in a <u>different</u> part of the office during the discussion, barely paying attention, while *Lowe discussed* ways to kill Baskin. Maldonado was "in his little cubicle area, making

---

[3] "Q. And then did you voluntarily turn those recordings over to Special Agent Bryant? A. Yes.") ("Q. Did you also, in the same fashion, give him text messages that you received from Mr. Passage or Mr. Lowe or anybody else in association with the zoo? A. Yes." Tr. 553 Garretson testimony.

phone calls, barely having an impact in the conversation unless Jeff was asking questions, or you know when someone jokes and laughs [and says] what do you think Joe.?" (App. Vol. 1, p. 123, 213).

Most stunning of all was the affidavit of Alan Glover, the purported "hired hit man." Glover swore in his affidavit that although Maldonado "always joked about wishing Carole Baskin . . . gone," it was Jeff Lowe who first approached Glover with the idea of staging a murder for hire against Baskin. Affidavit at 2. "Jeff Lowe wanted Carole Baskin dead and asked me to talk to [Maldonado and] ask him if he wanted her dead and offer myself as a hitman." Id.

According to Glover, "Jeff Lowe created the entire murder for hire plot from start to finish." Glover Affidavit, 2. Glover used Lowe's idea to "return home to South Carolina because [Maldonado] and I were not getting along." "I left the park on my own for personal reasons." Id. According to Glover's affidavit, he simply "stole" the three thousand dollars. *Id*. And although Glover said at trial that Maldonado paid him, he now attested that he had "no knowledge of the park finances and ha[d] no knowledge of where the $3,000 came from that [he]stole." *Id*.

Maldonado "did not give me the phone assigned to the Pizzeria. I took the phone from a recently fired employee named AJ." Id. at 4. "I testified that Joe

[Maldonado] took my phone from me and mailed it to Vegas; however, Jeff Lowe instructed me to give my phone to [Maldonado] and to ask him to mail it to Jeff's Las Vegas address." Id. Further, according to Glover, "James Garretson set up the entire fake ID plan." Id.

Thus, Glover recanted, *the source* of the murder for hire plot, the *source* of the funds involved, Maldonado's involvement in the plot, Maldonado's understanding of Glover's *purpose in leaving* the Park, and Glover's trial testimony that he enjoyed *no immunity* from prosecution (government officials "told me during trial prep that if I did what they asked then no charges would be brought against me now or in the future").

Each of these propositions discredited the murder-for-hire allegations. But Glover goes further:

> Upon my return to Oklahoma Jeff Lowe began instructing me what to say, how to say it and what to do in order to have [Maldonado] indicted . . . Jeff Lowe prepared me and told me what to say before I interviewed with the agents . . . Jeff Lowe told me that he wanted me to keep his name out of it. During my conversations with Jeff Lowe on June 17, 2018, and June 21, 2018, I was trying to say what I thought Jeff Lowe wanted me to say. During the June 17, 2018, call I was instructed by jeff Lowe to make sure Joseph Maldonado-Passage took the fall for the murder for hire plot. . .

Glover affidavit, 4.

So. Here was the "hired hitman" of a murder for hire case recanting his trial testimony and swearing under oath that Maldonado was wrongly convicted of a crime he did not commit; and that *another individual* (Jeff Lowe) did, in fact, initiate and commit the crime. An individual under the government's direction and protection.

## Glover's trial testimony was entirely scripted.

Glover admitted that he committed perjury during both his grand jury and his trial testimony. And he further revealed that his trial testimony was scripted in advance by the government like a Broadway musical. The affidavit gave names and dates:

> 38. During my interview . . . on July 13, 2018, Matthew Bryant made sure that I got my story straight . . . .

> 40. Agent Matthew Bryant, Amanda Maxfield-Green, and her supervisor, who was a short male, prepared me for my trial testimony. They told me during trial prep that if I did what they asked then no charges would be brought against me now or in the future. This meeting was either typed or recorded but was not provided to me.

> 43. Amanda Maxfield Green and Agent Matthew Bryant instructed me what to say to make sure that my story matched theirs to ensure Joe was put in prison. . . .

Glover affidavit, 5.

## Jeff Lowe's Affidavit.

Jeff Lowe also provided a sworn affidavit. "At the direction of Agent Matthew Bryant," wrote Lowe, "I began recording telephone calls with [Maldonado]." "When my conversations with [Maldonado] failed to provide the

information Agent Bryant needed . . . he instructed me to get the admissions from Allen Glover." "Matthew Bryant continuously directed me to try different ways of getting the information he needed from [Maldonado] to support the elements of the murder for hire." Jeff Lowe affidavit 3.

USFWS Agent Bryant "then orchestrated the questions I should ask on subsequent phone calls. This included Alan *falsely admitting* to his involvement with and/or participation in overt acts that would support the alleged murder for hire." "I did this at the direction of Agent Bryant because he told me we needed 'an overt act or it's all just talk.'" Lowe affidavit 3.

**The Newly Discovered Evidence Showed the Dead Tigers described in Counts 3-7 were Euthanized due to Age and Illness.**

Although trial evidence had painted Maldonado as a loathsome character who killed five healthy tigers to make room at the zoo for more profitable animals, the new evidence showed that the tigers were limping, declawed, and suffering from chronic illness. Moreover, the zoo's veterinarian had approved putting down tigers in such conditions.

At trial there was nothing to support Maldonado's defense except Maldonado's own testimony.  It was Maldonado's word against the evidence presented by the United States. Now there is evidence from *two sources* proving Maldonado's defense and *falsifying* the government's accusations. In fact the new

evidence shows that the government's act of cutting the heads off of the buried tiger carcasses without autopsies was deliberately conducted to conceal evidence of Maldonado's innocence.

### The District Court's Order.

On November 21, 2023 (more than 18 months after Maldonado's motion was filed) the District Court denied the motion with a 73-page order ("Order"). The Court also denied an evidentiary hearing.

The District Court employed almost every conceivable argument to deny the motion. First (1) the Court applied the "Berry test" to the motion, proclaiming that Maldonado failed to show that the new evidence would produce acquittal at trial, Second (2) the Court found the brief vague and poorly written. Next (3) the Court concluded that the recanting witnesses' affidavits didn't really contradict the witnesses' trial testimony at all. Then the court performed conceptual credibility assessments and said, "to the extent that [witnesses] recanted [their] trial testimony, the evidence already in the record permits the Court to conclude that the recantation[s are] not credible." Order at 19. The court (5) further determined that the testimony of witnesses who had not appeared at trial would not have been material or relevant.  The court (6) also construed sworn affidavits as mere "speculation" or "arguments."

Finally the court pronounced that the evidence of Maldonado's guilt on all nineteen counts was so undeniable that the new evidence was not credible. "[T]he strongest, most credible evidence against Defendant," wrote the District Court, were "his own words." The court described the new evidence as insufficient to undermine "the Court's confidence in the outcome of the trial. . . . because Defendant's statements provide overwhelming, powerful evidence of his guilt." Order, 59-60.

Maldonado now appeals the District Court's order.

## SUMMARY OF THE ARGUMENT

The District court applied the wrong rule for reviewing motions for new trial based on recanted trial testimony and admitted perjury by government witnesses. "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Bagley*, 473 U.S. 667, 678 (1985) (citations omitted).

Maldonado's motion laid out sufficient proof of newly discovered evidence to trigger a new trial, despite the District Court's denunciations of Maldonado's imperfect presentation. The District Court was dutybound to at least hold an evidentiary hearing. But the court denied an evidentiary hearing for Maldonado.

Two of the most important government witnesses in Maldonado's 2019 trial (Alan Glover and James Garretson) falsely testified that they did not have immunity from prosecution for their own crimes. But both witnesses now concede they testified against Maldonado in exchange for protection from the government. These witnesses appear to have had "Sword of Damocles" immunity agreements: unwritten promises by which the government leveraged their testimony. So long as the witnesses testified in ways that pleased the government, the witnesses were protected from prosecution.

If anything, such Sword of Damocles immunity deals are more pernicious and abusive to the fairness of the criminal justice system than expressly written immunity agreements. This is because written immunity is based on a witness delivering truthful testimony; while unwritten Sword of Damocles immunity can be used by the government to manipulate testimony to falsely convict an innocent defendant.

Above all, the new evidence presented by Maldonado highlighted that Maldonado was drawn into 'murder plots' in which he was not predisposed. Although the District Court cited Maldonado's own recorded words as "damning evidence" against him, the newly discovered evidence provides context to Maldonado's remarks.

Accordingly, Maldonado was entitled to a new trial, and an evidentiary

hearing.


## ARGUMENT

I.   **THE DISTRICT COURT APPLIED THE WRONG STANDARD FOR CONSIDERING A MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE WHICH INCLUDES RECANTATIONS AND PERJURY.**

As a preliminary matter, the District Court imposed the wrong standard for

its analysis of a motion for new trial under the circumstances. According to the

District Court, "[w]hen a new trial motion relies on newly discovered evidence,

the Court applies "the so-called *Berry* rule, derived from *Berry v. Georgia*, 10 Ga.

511 (1851)."  Under this five-part test, a defendant has the burden to prove:

> (1) the evidence was discovered after trial, (2) the failure to learn of
> the evidence was not caused by [his] own lack of diligence, (3) the
> new evidence is not merely impeaching, (4) the new evidence is
> material to the principal issues involved, and (5) the new evidence is
> of such a nature that in a new trial it would probably produce an
> acquittal.

Order at p. 5 (citing *Jordan*, 806 F.3d at 1252).

The court, in denying Maldonado's motion for new trial, used the *Berry* test as a figurative <u>battering ram</u>, repeating the "probable acquittal" standard over and over.[4]

But although the court insisted on the *Berry* test, the law is actually much more nuanced. The Supreme Court has never adopted Berry as the standard for granting new trials. An ALR article on this precise point runs to 44 pages: *"What standard, regarding necessity for change of trial result, applies in granting new trial pursuant to Rule 33 of Federal Rules of Criminal Procedure for newly discovered evidence of false testimony by prosecution witness,"* 59 A.L.R. Fed. 657 (1982). "The jurisdictions are divided as to which rule is applicable to newly discovered evidence of false testimony by a prosecution witness, with some

---

[4] • "Defendant does not explain why the jury would have probably acquitted had they known a cub sale to Mr. Engesser was not the source of the $3,000." Order at 21.
• "Nevertheless, this recantation does not entitle Defendant to a new trial because it would not probably produce an acquittal." Order at 23.
• "And Defendant does not even attempt to explain how the testimony would probably produce an acquittal in light of the extensive, credible evidence that Defendant caused [Glover] to obtain a fake ID." Order at 24.
• "Defendant makes no argument as to why the presence of the summons . . . "would probably produce an acquittal." Order at 26
• "Thus, it is entirely unclear how Mr. Glover's allegation would have probably resulted in an acquittal." Order at 26-27.
• "The Court will not speculate how Mr. Glover's admission . . . would probably produce an acquittal." Order at 27.
• "Defendant makes no attempt to explain how . . . it would probably produce an acquittal. . . . Accordingly, it moves him no closer to a new trial." Order at 35.

circuits holding that the "probability" rule is applicable, . . . with other circuits

holding that the "might" rule is applicable (. . . . with still other circuits in which

the law is unsettled . . ." *Id.* At 657.

The Tenth Circuit is one of the circuits described as unsettled.

A related A.L.R. Fed. article, "*Recantation of testimony of witness as*

*grounds for new trial—federal criminal cases,"* 94 A.L.R. Fed. 60 (1989),

addressing standards governing cases of recanting trial witnesses, is some 37 pages

long. Maldonado's motion involved <u>both</u> newly discovered evidence generally, as

well as the subcategory of recanting trial witnesses.

Perhaps the most detailed discussion of this controversy in the Tenth Circuit

occurred in *United States v. Jackson*, 579 F.2d 553, 554–61 (10th Cir. 1978),

where this Court split two to one on the question. *Jackson* involved the recantation

of an informant who admitted he misidentified Jackson's codefendant at trial. *Id.*

at 558. Tenth Circuit cases seem to have applied both variations of the *Larrison*

rule and the *Berry* rule, compare *United States v. Briola*, 465 F.2d 1018 (10th Cir.

1972), Cert. denied, 409 U.S. 1108 (1973), with *United States v. Jordan*, 806 F.3d

1244, 1252 (10th Cir. 2015) (applying the *Berry* test).

The *Larrison* Rule, stemming from *Larrison v. United States*, 24 F.2d 82

(7th Cir. 1928), holds that a new trial should be granted where (1) the court is

reasonably satisfied that testimony given by a material witness is false, (2) that without it the jury **might** have reached a different conclusion, and (3) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet or did not know of its falsity until after the trial. This rule has been loosely termed the **"possibility"** test.

Maldonado's new evidence includes recantations of the most important witnesses in the trial, including the alleged "hired hitman," as well as the undercover FBI informant who surreptitiously recorded Maldonado. These recantations discredit the whole of the government's case.

Courts seem to treat this question (of what analysis to apply) as highly dependent on circumstances, assessing the burden differently depending on whether false trial testimony was knowingly or just negligently used by the government, *e.g., United States v Krasny*, 607 F2d 840 (9th Cir. 1979), whether the new evidence is merely impeaching, or whether the recanting witness was an accomplice or codefendant of the movant.

In this case, Maldonado's newly discovered evidence is both exhaustive and profound, discrediting the key evidence against Maldonado. For example, Maldonado's new evidence establishes that the *government deliberately concealed* the deceased tiger carcasses (presenting only the decapitated tiger heads) described

in Counts 3 through 7 in order to deprive the defense of proof that Maldonado

lawfully euthanized the tigers due to illness. The new evidence also shows the

government knew that much of Glover's trial testimony was false, including the

source of money for the proposed 'hit,' the nature of the transactions, and the fact

that the phone that Glover took on his trip eastward was a business phone he stole

from Maldonado's pizza restaurant, rather than a 'burner phone' provided by

Maldonado.[5]

Even the majority in *Jackson* "recognize[d] that the *Berry* rule is not

generally applied to cases involving recantation or perjury." *Jackson*, 557 n.3

(providing citations). Justice Logan even dissented from applying the Berry rule

even to the facts in *Jackson*, writing "I am convinced we should adopt the *Larrison*

. . . rule where, as here, recantation or perjury is involved." *Jackson*, 560 (Logan,

J., dissenting).

Neither the Tenth Circuit nor the Supreme Court have ever adopted the

*Berry* Rule as a standard for cases involving (as here) false testimony by *multiple*

accusing witnesses, sworn recantations by would-be *accomplices* regarding central

elements, and deliberate concealment of exculpatory evidence by investigators.

---

[5] The government concealed exculpatory text messages in the pizza phone which
plainly revealed that Glover stole the phone, and Glover was *not* provided with the
phone by Maldonado.

(*e.g.,* Glover affidavit: "I committed perjury during my trial testimony regarding my involvement as the hitman in the murder for hire," "They told me during trial prep that if I did what they asked then no charges would be brought against me . . ."; Garretson affidavit: "I was provided protection from the government in return for signing up as a confidential informant").

Indeed, the Supreme Court appears to have long ago rejected the *Berry* "probable acquittal" test whenever a trial is found to have been tainted by knowingly deceptive, materially inaccurate testimony. "A new trial is required if 'the false testimony could . . . *in any reasonable likelihood have affected the judgment of the jury* . . .'" *Giglio* at 154, citing Napue, at 271, 79 S.Ct., at 1178. Later, in *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court pronounced that the standard in such cases is not whether a defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Kyles v. Whitley*, 514 U.S. 419 (1995).

Courts of Appeals ordinarily review a denial of a motion for new trial for an abuse of discretion. But the District Court exercised its discretion based on a legal error, which would necessarily constitute an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law.").

## II. MALDONADO FILED AN EXTREMELY DETAILED MOTION SUPPORTED BY OVERWHELMING EVIDENCE; BUT THE DISTRICT COURT ERRONEOUSLY CONSTRUED THIS MASSIVE WEIGHT AS "BURIED TRUFFLES."

After applying the wrong standard for considering Maldonado's motion, the District Court pronounced that Maldonado "makes only a perfunctory attempt to satisfy his burden." *Id.* "For the most part," wrote the District Court, "Defendant's Motion does not engage with the five *Berry* elements, cite exhibits with particularity, identify which of the nineteen counts (or their elements) are implicated by each piece of newly discovered evidence, or state which specific trial statements or evidence is undermined by each piece of newly discovered evidence. Order at 4, 5. Accordingly, the court held, none of Maldonado's evidence warranted a new trial. Order at 6.

The District Court, in its order, labeled Maldonado's 67-page motion and brief a "skeletal" pleading.  (This after the court denied Maldonado's application to file an overlength brief due to the weight and volume of new evidence.) The Court repeated the well-worn aphorism that a court is 'not a pig hunting for truffles.' "To the extent Defendant asks the Court to comb the record and craft arguments he did not make, the request is improper," said the court. Order at 7 (quoting *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs"). *"[S]everal* arguments that implicate [newly

discovered evidence found in the] recordings are too vague and conclusory for Court to meaningfully analyze," wrote the court.

As illustrative, Judge Palk picked the most extreme examples of Maldonado's "vague and conclusory" paragraphs and reprinted them in block quotes, suggesting that the examples were endemic. One paragraph alone cited "27 exhibits spanning 352 pages without pinpoint citations or highlights," wrote the court. Order, 8 n.10.

But these worst examples of Maldonado's brief were mostly in the nature of *introductory-type* paragraphs, referencing numerous exhibits. In fact it seems Maldonado's citation strings of exhibits were proffers of the *sheer weight* of newly discovered evidence. Elsewhere in the brief, Maldonado provides further details.

For example, on pages 25-27, Maldonado addresses Lauren Lowe's affidavit and text messages. She admitted that evidence was fabricated in an effort to falsely implicate Maldonado. This information is very precise and refers to exhibits with specificity.

## III.   THE DISTRICT COURT WRONGLY DENIED AN EVIDENTIARY HEARING.

Some types of hearings require evidentiary hearings. When a motion for new trial is based on recanted testimony, a trial court must carefully examine inconsistencies between trial testimony and the recantation testimony. *United*

*States v. Bradshaw*, 787 F. 2d 1385, 1391 (10th Cir. 1986). To make this determination, the trial court must usually conduct an evidentiary hearing. *United States v. Page*, 828 F. 2d 1476, 1478 (10th Cir. 1987).

The District Court acknowledged that evidentiary hearings are normally mandatory to properly evaluate "both the credibility and the impact of a recantation." Order at 17. But the court summarily pronounced that "[u]pon careful consideration of both the affidavits and the trial record, the Court concludes no evidentiary hearing is warranted in this case." Id, citing an unpublished case, and *United States v. Pearson*, 203 F.3d 1243, 1274–75 (10th Cir. 2000)).

Maldonado's new evidence and affidavits and are filled to overflowing with irreconcilable inconsistencies compared to the trial. But in numerous places the District Court purported to perform complete 'credibility assessments' without a hearing. A few examples:

1. ***the Court doubts the veracity* of Mr. Glover's affidavit based on the other evidence in the record. First, Agent Bryant has *submitted a competing affidavit* in which he claims that "[t]o his knowledge, no immunity or promise of immunity was offered" to Mr. Glover. . . . Similarly, Mr. Glover testified at trial that he did not receive an offer of immunity. . . . ("Solemn declarations in open court carry a strong presumption of verity."). Finally, a recorded phone call between the Lowes and Agent Bryant lends credence to Mr. Glover's trial testimony. Following the conclusion of Defendant's trial, Mr. Lowe *joked* that Agent Bryant "ought to go down there, scare the shit out of [Mr. Glover]."**

Order at 54 (emphasis added).

So: (1) the mere submission of a "competing affidavit" that there was no promise of immunity "to [one agent's] knowledge," (2) the now-known-to-be-false trial testimony by Glover of having no immunity, and (3) a joke by a nongovernment actor summarily ended the inquiry without an evidentiary hearing.

Appellant addresses Glover's obviously false 'no-immunity' testimony in response to the government's string of leading questions, in violation of Rule 611) below. No reasonable observer with legal training could believe Glover took the witness stand under the circumstances with no immunity understanding.

### "Greater Solemnity" of Trial Testimony compared to Affidavit Testimony?

Regarding the notion of greater 'solemnity' of trial testimony compared to affidavit testimony, *it seems to be a recurring practice* among federal prosecutors to instruct government witnesses to falsely deny immunity deals. *See Harris v. Lafler*, 553 F.3d 1028 (6th Cir. 2009) (key witness was told to deny that deal was made for his testimony; after trial, when this came to light, Sixth Circuit invalidated the conviction). Some prosecutors have been caught offering deals to *lawyers for* government witness so that the witnesses could falsely say they have no immunity. See *Phillips v. Ornoski*, 673 F.3d 1168 (9th Cir. 2012) (deal was reached between prosecutor and witness's attorney, conditioned on attorney's agreement not to tell the witness). See also *Hayes v. Brown*, 399 F.3d 972 (9th Cir. 2005) where a prosecutor and a witness's attorney reached agreement to **not disclose the agreement to the witness**, so he could deny the deal's existence. This also occurred in *Gilday v. Callahan*, 59 F.3d 257 (1st Cir. 1995) (prosecutor made deal with witness's attorney that, if the witness testified, no criminal charges would

be brought. The witness's attorney did not reveal this to the witness, but told him that it would be in his best interest to testify; a Brady violation).

As these cases illustrate, trial testimony is by no means more intrinsically 'solemn' or trustworthy than affidavit testimony. *Martin v. United States*, 889 F.3d 827, 833 (6th Cir. 2018) (stating when a court considers whether to grant an evidentiary hearing, the court shouldn't regard "a 'self-serving' affidavit" as "inherently incredible").

In light of these reasons, the court's conclusion that Glover's trial testimony was more believable than Glover's affidavit testimony is itself incredible. An evidentiary hearing would have provided an opportunity to fully analyze the evidence.

Another example:

2. **"Mr. Garretson testified at trial that he did not receive immunity, see Tr. at 579:19–23, even for the lemur, *see id*. at 580:7–23. Accordingly, the Court finds the contention that Mr. Garretson did receive immunity to be wholly incredible."** Order 56-57.

Garretson now admits that he "was provided protection from the government in return for signing up as a confidential informant." Garretson affidavit, 1. Garretson's new recordings also contain a reference that "the feds told the USDA to leave me the fuck alone." 232-9.

At a bare minimum, the District Court had a duty to preserve the integrity of the criminal justice system. If parties are submitting false affidavits, the District Court is obligated to investigate. Such remedies are not limited to cases of actual innocence, since they seriously affect the integrity or public reputation of proceedings." *United States v. Olano*, 507 U.S. 725, 736 (1993) (citations omitted).

Maldonado's newly discovered facts were sufficient to trigger a new trial in any jurisdiction in the United States. *See United States v. Sanchez-Sotelo*, 8 F.3d 202, 212-13 (5th Cir. 1993) (abuse of discretion in denying evidentiary hearing on new trial motion when defendant made "colorable showing"); *United States v. Salem*, 578 F.3d 682, 686-88 (7th Cir. 2009) (abuse of discretion in denying evidentiary hearing on Brady violation because impeachment evidence against government's key witness could have changed outcome of case); *United States v. Rojas*, 520 F.3d 876, 884-85 (8th Cir. 2008) (abuse of discretion in denying evidentiary hearing when sole witness against defendant allegedly recanted testimony and no physical evidence against defendant existed.).

### Allen Glover's recanted testimony.

Especially significant in this case was the testimony of the supposed hired hit man, Allen Glover. Oddly, this would-be "hit man" was never charged, and appears never to have seriously been threatened with prosecution. Motion, p. 23.

But in the wake of Maldonado's conviction and prison sentence, Glover revealed that his trial testimony was fundamentally false.

One can scarcely immagine a more clear-cut basis for re-evaluation of Maldonado's convictions. The Glover revelations cry out for an evidentiary hearing and a new trial. Yet the District Court swept away Glover's affidavit—*corroborated by three sources of evidence*—by saying "it is <u>not clear</u> that Mr. Glover has recanted his trial testimony…." Order p. 18.

<u>But where it is *not clear*</u> if a witness recanted his trial testimony, *an evidentiary hearing is required* to make the matter <u>more clear</u>. *See Grisby v. Blodgett*, 130 F.3d 365 (9th Cir. 1997) (finding a full evidentiary hearing should have been conducted where a witness's post-trial recantation revealed he had an immunity deal with detectives).

A third example:

**3. "Because the Court is satisfied that Mrs. Lowe's trial testimony is truthful, her affidavit does not entitle Defendant to a new trial."** District Court Order at 25.

Mrs. Lowe's trial testimony (which the District Court described as truthful) was that while in Las Vegas, she received just 'two or three packages' from the zoo in November 2017, with two being her "regular mail" and the third being an envelope containing a "throwaway phone" and a charger. Tr. Trans. 713. By contrast, Mrs. Lowe's recanting affidavit states that "[t]he package I opened on

November 27, 2018, contained a summons from PETA regarding Tim Stark. . . . I cannot say for certain that the package I opened on November 27, 2018 contained . . . Glover's phone." Lauuren Lowe affidavit, at 2-3.

Significantly, Mrs. Lowe's recantation account is corroborated by *physical* evidence. (U.S. postal records show the package fitting the description weighed *almost five* pounds—consistent with a PETA summons <u>but not a cell phone</u>; and a contemporaneous text by Lowe (11/28/2017) stated "that package arrived today. It had a Peta summons." Motion at 29.) Yet somehow the court was "satisfied that [her] <u>trial</u> testimony (which <u>defies the physical evidence</u>) was "truthful."

## IV. THE NEWLY DISCOVERED EVIDENCE REGARDING THE ILL HEALTH OF THE BURIED TIGERS PROVES MALDONADO WAS WRONGLY CONVICTED OF COUNTS 3-7.

Counts Three through Seven involved claims that Maldonado violated the Endangered Species Act by "taking" (i.e., killing) five endangered tigers. The Act arguably was never intended to apply to zoo animals.[6] But even if the law applied

---

[6] In Maldonado's words:
> The word "take" is to pursue, harass, harm, shoot, kill,
> wound, capture, or collect an endangered species. That is for
> something in the wild, that's not something born in a zoo or
> every zoo owner would be arrested by now, and every circus owner
> would be arrested for harassing an animal to make them jump
> through a hoop. This is for animals in the wild, has nothing to
> do with this.

Tr. Trans. 993 (Maldonado testimony).

to situations like Maldonado's, the allegations against Maldonado required proof that Maldonado violated actual, written, regulations or protocols in euthanizing his exotic animals. The Greater Wynnewood Exotic Animal Park relied on regulatory constructions recognized by agencies such as EPA, USDA, and the U.S. Fish & Wildlife Service. Those protocols expressly allowed dying or lame tigers to be humanely euthanized without advance government authorization.

Convicting Maldonado required evidence that the five tigers were healthy. (Simultaneously, however, the government argued that Maldonado greedily and heartlessly executed the tigers because they had ceased being "breeders"—in line with the government's allegations that Maldonado operated a tiger cub mill where nonbreeding cats were considered useless eaters.)

Maldonado's defense to the Counts Three was straightforward. Maldonado said the five tigers were properly put down because they were elderly, limping or ill. At trial there was nothing to support Maldonado's defense except Maldonado's own testimony. Now there are *two sources* proving Maldonado's defense, and *falsifying* the government's trial evidence.

Both the Jeff Lowe affidavit and the Reinke affidavit attest to this. Additionally, the new evidence shows that the government's act of cutting the

heads off the tigers while leaving the carcasses buried without autopsies <u>was deliberately conducted to conceal</u> evidence of Maldonado's innocence.

Indeed, the new evidence shows that the government brought the tiger-killing charges against Maldonado solely to smear Maldonado in the jury's eyes—so that the jury would overlook the weakness of the murder-for-hire case.

> On February 13, 2019, Lowe recorded a phone call with Bryant (see Exhibit 128.) In this call Bryant admitted the government joined Counts 1 and 2 [the murder-for-hire counts] with 3-7, because they wanted to "get some jurors' heartstrings bleeding on shooting those cats and showing pictures of the tiger dig and all that. And they might be prejudicial where we're weak on the murder for hire. . . .

Motion at 45.

**Reinke's affidavit dismantles Maldonado's tiger-killing convictions.**

John Reinke's affidavit stated that Reinke "kn[e]w for a fact that all the five tigers were humanely euthanized." Affidavit of Reinke 3. Not (as prosecutors contended in Maldonado's trial) to make room for animals from a circus. Reinke further explained that "All five tigers that were euthanized were authorized by the USDA." Motion at 33. Most significantly, Reinke's affidavit suggested the reason that the government dug up only the heads of the five tigers and not the bodies.[7]

---

[7] Reinke's affidavit stated, "the bodies would have revealed evidence that proved euthanization of these tigers was proper as authorized by the USDA." Motion at 33.

"The five tigers . . . were NOT shot to make room for the animals from [the Circus]." Reinke affidavit, p. 3.

"There was a protocol created and authorized by Dr. Green and the USDA to euthanize the tigers when they were sick. The protocol for declawed tigers involved provided them with medication or euthanizing them." "All five tigers that were euthanized were authorized by the USDA. I tried to tell this to [the government], however they didn't want to know it." Id. p. 3.

"I told [the agents, including the prosecutor] that the euthanized cats were declawed and limped. I told [them] that USDA 'wanted the zoo to do something with the limping cats,' which should be in the USDA's notes." Reinke's affidavit 3-4.

This is exculpatory evidence that would have acquitted Maldonado on Counts 3-7. And worse: the prosecution *knowingly concealed* this evidence *to convict Maldonado of crimes he did not commit*.

On page 53 of the order, Judge Palk casually dismisses this Brady evidence.

> Next, [Maldonado] argues investigators suppressed evidence by separating the tigers' heads from their bodies and taking only the skulls. He claims that "the government intentionally left the tiger bodies in the ground in an attempt to prevent [Defendant] from having the ability to prove the animals were euthanized because of illness." Mot. [Doc. No. 232] at 44. The argument that the tigers' bodies would

reveal evidence of infirmity or illness is *entirely speculative* and, therefore, insufficient to support a Brady claim.

Order at 53 (emphasis added).

First, the "argument" that the tiger bodies would reveal evidence of infirmity is <u>much more than speculative</u>. A sworn affidavit is presumptive evidence of the facts stated therein. *Damaj v. Farmers Ins. Co., Inc*., 132 F.3d 42 (10th Cir. 1993) (reversing summary judgment where an affidavit contests the movant's proffered facts). An affidavit "is evidence for purposes of determining whether a genuine issue of material fact exists."  *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992) (citing Fed.R.Civ.P. 56(c)). Thus the District Court plainly abused its discretion in dismissing an affidavit by the Park manager—the person with the most knowledge of the tigers' health—as mere speculation.

Reinke's affidavit was point blank: "The bodies would have revealed evidence that would prove euthanization of these tigers was proper as authorized by the USDA." Reinke affidavit at 4.

Reinke's affidavit even shattered the false trial testimony that the five deceased tigers "were chosen because they were not breeders."  (This was part of

the government's narrative that greedy, despicable Maldonado, in his lust for funds, killed the tigers because their usefulness as breeders was over.[8]

As Reinke attests, "all of the cats but Cuddles were breeders." P. 6. The five cats "had bad arthritis. . . . They were old in age. [and] were present at the park when I arrived in 2005 and were previously owned by Jay Riggs." P 6. "During routine inspections at the park, USDA inspectors would always tell me that I needed to put some of the old crippled tigers down." P. 6.

Thus new evidence reveals a clear Brady violation. It is undeniable that the withheld evidence was of an exculpatory nature, and Maldonado is entitled to a new trial on this basis alone. *United States v. Gregory*, 983 F.2d 1069 (6th Cir. 1992) (reversed where government's suppression (as "irrelevant") of audio portion of a videotape deprived defendant of ability to prove that some police officers estimated 45 to 50 marijuana plants as opposed to 112 plants (for which defendant was sentenced for possessing). Had the withheld evidence been available,

---

[8] Prosecutors emphasized Maldonado's avarice during closing argument
     They were adult tigers, and there was nothing wrong with them. . . .
        As Mr. Cowie and Mr. West told you, Mr. Passage shot them because he couldn't use them to make money. They were too big for play times and they weren't producing cubs. And his cages were at capacity; he needed to make room for cats that would make him money.

Tr. Trans. 1059 (closing argument of the United States).

defendant could have attempted to prove that the lower estimate was more reliable than the higher count. *United States v. Pelullo*, 105 F.3d 117 (3d Cir. 1997) (granting a new trial in a corporate fraud case because a law enforcement officer's notes *corroborated* the defendant's theory that allegedly fraudulent money transfers had been performed for the legitimate purpose of repaying corporate debt).

## V. NEW REVELATIONS OF UNDISCLOSED IMMUNITY DEALS BETWEEN THE GOVERNMENT AND ITS WITNESSES.

In Maldonado's trial, virtually every important government witness was subject to potential prosecution. This included not only Glover (the 'hired hit man'), but also Garretson (Endangered Species Act violations, Lacy Act violations), and potential witness Jeff Lowe (potentially facing virtually every violation lodged against Maldonado; as well as other crimes including sex trafficking and credit card fraud).[9]

This list also included the zoo's veterinarian, Dr. JoAnne Green. Green had signed off on the animal certificates and other paperwork which were the subject of

---

[9] See affidavit of Glover, at 6 ("I have personal information about James Garretson, Jeff Lowe and/or Lauren Lowe involving sex trafficking and credit card fraud." "I have personal information of fraud committed by jeff and/or Lauren Lowe relating to other people's property.").

Glover affidavit, at 6. In Lowe's words, "Agent Bryant helped circumvent the USDA requirement for vet of record after Dr. Green left for providing him with information in the case." Jeff Lowe affidavit, 3. Thus, Lowe was able to operate the zoo by evading USDA requirements with impunity, protected by Agent Bryant.

the majority of Maldonado's criminal counts.[10] After trial, newly discovered evidence revealed that the government openly threatened Dr. Green with arrest if she did not testify against Maldonado. (The District Court summarily dismissed the import of such threats, saying "[a]t its core, Defendant's argument appears to be that the Government violated *Giglio* by subpoenaing Dr. Green's testimony. He has provided no analysis showing that fact of Dr. Green's subpoena satisfies any part of the *Brady/Giglio* analysis." Order at 55-56.

Glover and Garretson testified at trial that they had no immunity agreements with the government. But among the newly discovered evidence were revelations that these witnesses were, in fact, rewarded with government favors and protection so long as they testified the way the government wished. These revelations are

---

[10] Reinke affidavit, 4 ("I prepared all the transfer forms for any and all animals at the Greater Wynnewood Exotic Animal Park except for the short period of time that I left the park. Joseph Maldonado-Passage was convicted for Lacey Act violations based on paperwork that Dr. Green and I completed.")

> 25. I told Agent Bryant, Agent Farabow, and AUSA Amanda Green that I was the one who prepared the forms along with Dr. Green.
> 26. The CVI form that had the box checked for "sale" was done by Dr. Green's assistant. When I was completing this form, I forgot to check the transfer box. Since the transfer cannot be done without a completed form, the sale box was check by Dr. Green's assistant when filling out the form.

Affidavit of Reinke, 5.

memorialized in both Glover's[11] and Garretson's[12] affidavits, with references to specific dates, places and other details.

Judge Palk cast aside any notion that there were hidden immunity deals (despite Glover's and Garretson's sworn affidavits saying so, supported by corroborating evidence). "[N]o credible evidence support[ed] [Maldonado's] claim that the United States concealed the existence of a non-prosecution agreement," wrote the court).

### Undisclosed favors for Glover.

First, it seems admitted that the government made pretrial phone calls (undisclosed to the defense) to influence local state prosecutors to deaden Glover's pending state DUI charge. Jeff Lowe's affidavit (at page 6) states that Agent Bryant "made some calls to get Alan Glover's DUI case handled."  Bryant indicated that a "conviction could impune the credibility of" Glover. "Bryant called Sheriff Rhodes the day before Alan's arraignment and worked out a deal . . . to keep this off Alan's record." The District Court shrugged off this influence on

---

[11] "40. Agent Matthew Bryant, Amanda Maxfield-Green, and her supervisor, who was a short male, prepared me for my trial testimony. They told me during trial prep that if I did what they asked then no charges would be brought against me now or in the future." Glover affidavit, 5.

[12] " I was provided protection from the government in return for signing up as a confidential informant." Garretson affidavit, 2.

Glover's behalf with a remark that Glover's misdemeanor DUI could not have been mentioned at trial under Rule of Evidence 609(a). Order at 54.

But this is obvious misdirection.  It doesn't matter whether Glover's DUI conviction would have been admitted or not admitted. What matters is that the government *performed favors for Glover*; and that both the government and Glover lied during the trial regarding these favors in order to mislead the jury.

And of course, these favors to Glover pale in comparison to the biggest reward of all: the nonprosecution of Glover for being 'hired as a hit man' in *this* case. Shockingly, the District Court discounted the exposure faced by Glover:

> the Government explained that its "decision not to prosecute Mr. Glover resulted from the limited scope of federal law and the evidence that it possessed, not a promise of immunity," a contention which the Court finds credible. Resp. [Doc. No. 237] at 54 n.16. Because the evidence at trial consistently showed that Mr. Glover "did not intend to kill Mrs. Baskin," the Government argues, he "did not use any facilities of interstate commerce to facilitate a murder for hire." Id.

Order, pp. 54-55.

Imagine being able to commit all the elements of murder-for-hire but being able to avoid any threat of prosecution *merely by saying* there was never intent to finish the job. This seems to actually be the holding of the District Court in this case regarding Glover's criminal exposure. (*Note that such a rule, if it exists, should likewise* immediately *release Maldonado himself*!)

While the District Court pronounced that Glover was not subject to prosecution simply because Glover said he had no intent to finish the murder, the facts show that a team of law enforcement officers were *poised, and at the ready* to arrest Glover immediately upon Glover heading to the bus station to travel eastbound. FBI Agent Farabow testified to this:

> A. Well, we were planning to arrest Mr. Glover upon his arrival
> at the bus station if -- if he traveled that morning of the 17th.
> Q. Okay.
> Again, this -- the date of the 17th, how did that
> come to be a date that you associated with him leaving?
> A. That was the information that we had from Mr. Garretson.
> Q. Okay. And had the FBI and the Fish & Wildlife Service put
> together an operation plan?
> A. Yes, ma'am.

Tr. Trans. 445, direct examination of Farabow

So the government preposterously contends on one hand that it had <u>probable cause to arrest</u> Glover "upon his arrival at the bus station"; while on the other hand contending that Glover never needed any immunity from prosecution because of "the limited scope of federal law." The same preposterousness applies to the notion that Glover "did not use any facilities of interstate commerce to facilitate a murder for hire" <u>by flying commercially</u> across state lines, even though Glover could have been arrested upon mere "arrival at the bus station."

The court's assertion that Glover benefited from no immunity, no favors and no protection is utterly ridiculous in this case, given that Glover also admitted on the witness stand to committing at least a half dozen *other* crimes including illegal narcotic use, possessing fake ID, driving while so intoxicated that he lost all awareness of his location, using firearms at the zoo despite being a felon, and stealing thousands of dollars. Any reasonable person would have invoked the 5th amendment and refused to testify under such circumstances. But Glover confessed to such felonies without fear of prosecution—*if he gave the government what it wanted*.

### Garretson's Conditional Immunity.

**The District Court concedes that the record reflects that different government officials disagreed regarding whether Garretson had immunity. Under the rule of *Giglio*, this means Garretson <u>had</u> immunity—and thus the jury was misled.**

Judge Palk held that where different officials have different opinions about a cooperating witness having immunity, that witness does not have immunity:

> Defendant next claims the Government failed to disclose its purported immunity agreement with Mr. Garretson. He cites only one conversation with particularity—Mr. Garretson's post-conviction interview with the FBI. In that interview, he claims that former AUSA *"Amanda Green told [him] that [he] wouldn't be charged for this lemur."* Def.'s Ex. 152 [Doc. No. 232-150] at 6. But in this same interview, he also states he "was never given immunity," and that he "was told until the day [he] was going to court that [he] could still be charged for the lemur." Id. at 6, 24. The Government cites to five other instances where Mr. Garretson denied receiving immunity. Mr.

> Garretson testified at trial that he did not receive immunity, see Tr. at 579:19–23, even for the lemur, see id. at 580:7–23. Accordingly, the Court finds the contention that Mr.Garretson did receive immunity to be wholly incredible.

Order at 56-57.

But the law is precisely the opposite.

**The original Giglio case was startlingly similar to Garretson's situation.**

In fact, Garretson's precarious situation was *startlingly similar* to the original *Giglio* case. In *Giglio, the government's key witness*—just as Garretson— had an unspecified, unwritten threat of prosecution dangling over his head—with hints by some government officials but not others that he was protected by immunity, so long as his testimony pleased the government. This type of *implicit* threat (and promise) is at least as powerful as an explicit promise memorialized in an immunity agreement, if not more so. Garretson's *uncertainty* about having immunity—and thus having a potential threat of prosecution dangling over him— were quite similar to the statements the Supreme Court held needed to be disclosed in *Giglio v. United States*, 405 U.S. 150, 150–55 (1972).

Moreover, the District Court's point that "At trial, [Maldonado's] defense counsel cross-examined Mr. Garretson about the fact that he had not been prosecuted for the illegal lemur purchase," Order at 57, likewise applied to the

*Giglio* case.[13]  But the Supreme Court found Giglio had been denied due process

because the true scope of protection for Giglio's accusers had not been disclosed.

As the *Giglio* Court recognized, the existence or nonexistence of a written

immunity agreement is not as important as the *fact* of a potential prosecution and

the extent to which prosecutors leverage the potential threat of prosecution against

a witness.[14] In *Giglio*, different prosecutors had given the accusing witness

differing promises, ranging from no immunity to full immunity.  The Supreme

Court held that <u>even one</u> prosecutor's promise of immunity was sufficient to bind

---

[13] If anything the defense counsel in *Giglio* cross-examined the witness more
vigorously on this issue than did Maldonado's defense counsel:
>    (Counsel.) Did anybody tell you at any time that if you implicated
>    somebody else in this case that you yourself would not be prosecuted?
>    (Taliento.) Nobody told me I wouldn't be prosecuted.
>    Q. They told you you might not be prosecuted?
>    A. I believe I still could be prosecuted.
>    . . . . . .
>    Q. Were you ever arrested in this case or charged with anything in
>    connection with these money orders that you testified to?
>    'A. Not at that particular time.
>    Q. To this date, have you been charged with any crime?
>    A. Not that I know of, unless they are still going to prosecute.

Giglio, supra, at 151-52.

[14] In *Giglio*, different prosecutors within the U.S. Attorneys Office had given the
accusing witness differing promises, ranging from no immunity to full immunity.
The Supreme Court held that even one prosecutor's promise of immunity was
sufficient to bind the Justice Department.  The heart of the matter is that one
Assistant United States Attorney—the first one who dealt with Taliento—now
states that he promised Taliento that he would not be prosecuted if he cooperated
with the Government." *Giglio*, at 154.

the Justice Department. "The heart of the matter is that one Assistant United States Attorney—the first one who dealt with Taliento—now states that he promised Taliento that he would not be prosecuted if he cooperated with the Government." *Giglio*, at 154.

If AUSA "Green told [him] that [he] wouldn't be charged for this lemur," while other prosecutors said otherwise, he had immunity. This is blackletter law after *Giglio*. The government (and Garretson) deceived the jury during trial, and Maldonado is entitled to a new trial in the same way that Giglio was.

## Sword of Damocles Immunity Understandings are *More* Powerful and Pernicious than Explicit Written Immunity; not *Less*.

If anything, a "sword of Damocles" immunity understanding is *more* powerful—and pernicious—than any explicit immunity contract. This is because a written immunity agreement explicitly limits a witness to truthful testimony; while an unwritten sword of Damocles threat held over a witness's head ensures that the witness must say whatever the government wants—true or false—in order to avoid prosecution.

In this case there is plentiful evidence referenced in Maldonado's motion showing the government dangling such a sword, e.g., Def.'s Ex. 9 [Doc. No. 232-9] at 2, 43 (specifically referenced by the District Court at Order, p. 56, n51 (telling Defendant's post-conviction counsel: "I never had immunity   *They'd bring up the*

*lemur all the time*, 'Well, we can still charge you for the lemur, we can charge

you.' And then up until the Saturday before trial when we were at the trial prep I

*was told I could still be charged. . . .")* (emphasis added).

### A similar sword of Damocles Understanding was used to force *Glover* to Testify in Accordance with the Government's Theory.

Similarly, Sword of Damocles immunity—undisclosed to Maldonado and

concealed from the jury—was used to keep Glover from departing from the

government's theory. The newly discovered evidence (which includes Glover's

admission that officials "told me during trial prep that if I did what they asked then

no charges would be brought against me now or in the future") shows that Glover,

too, was kept in a precarious position by prosecutors. Without written immunity,

but with reassurances that Glover would avoid trouble only by doing "what they

asked," Glover was a tool in the government's hands.

Judge Palk's casual dismissal obscures both the fact that Glover's immunity

had been secretly promised, but that that such immunity <u>was contingent on

Glover's testimony pleasing the government</u>. This revelation is a *greater due

process violation* than a mere undisclosed written immunity contract.

> Agent Bryant replied [to Lowe's joke], "That poor man. I got to like
> him throughout the case . . . and **it would scare him to death if I was
> to go down there and go, well, I tried, buddy. I tried to keep you
> out of trouble." Id. Based on Agent Bryant's candid statement, it
> appears Mr. Glover still feared prosecution.** Additionally, the
> Government explained that its "decision not to prosecute Mr. Glover

resulted from the limited scope of federal law and the evidence that it possessed, not a promise of immunity," a contention which the Court finds credible.

Order, pp. 54-55 (emphasis added).

This excerpt—rather than "lending credence to Mr. Glover's trial testimony"—*utterly discredits it*. "I tried, buddy. I tried to keep you out of trouble" is *tinged with admission* that previous immunity promises had been made— contingent on Glover testifying according to script. Above all, this means that the jury was deceived by false reassurances that the witness was testifying altruistically, without self-interest.

If anything, an implicit, or tacit, understanding is <u>more abusive</u> to the criminal justice system than an explicit written agreement. See *Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) (tacit agreements must also be disclosed under *Brady*, not just express agreements). And above all, the jury was deceived into a false belief that Maldonado's accusers were unbiased witnesses. *See United States v. Smith*, 77 F.3d 511 (D.C. Cir. 1996) (new trial ordered where government failed to disclose entirety of favors given to incriminating witness; had there been full disclosure, defense could have challenged the witness's assertion that he was testifying only to "get a fresh start").

When years pass after an important government witness should have logically faced serious criminal charges, a presumption arises that the witness has

been rewarded for his testimony. *See, e.g., United States v. Morris*, 498 F.3d 634 (7th Cir. 2007) (prosecutor repeatedly stressed during trial that cooperating witness was facing a mandatory minimum ten years imprisonment. After trial, the prosecutor filed a motion for a downward departure, including relief from the mandatory minimum. This amounts to prosecutorial misconduct. *See also Grisby v. Blodgett*, 130 F.3d 365, 368 (9th Cir. 1997) (witness caught with briefcase containing cocaine, heroin, and cash was never prosecuted; raising serious questions concerning his credibility which implicate the fairness of the trial); *United States v. Smith*, 77 F.3d 511 (D.C.Cir. 1996) (reversible error where government failed to reveal that one government's witnesses had a D.C. Superior Court case dismissed against him).

## VIII. THE NEWLY DISCOVERED EVIDENCE PUTS "THE MOST DAMNING EVIDENCE AGAINST" MALDONADO IN PLAIN CONTEXT.

Above all, these dozens of new pieces of evidence place various snippets of remarks by Maldonado—said to be "the most damning evidence against him"—in plain context. Maldonado was surrounded by individuals who (like himself) detested Carole Baskin's tactics and lawfare against the exotic animal community and who often joked about assassinating Ms. Baskin.

The District Court repeatedly discounted the new evidence of Maldonado's innocence, by saying that "the strongest, most credible evidence against Defendant

[were] his own words." Maldonado's secretly recorded "statements provide overwhelming, powerful evidence of his guilt," "the most damning evidence against him," wrote the court. Order, 59-60.

One "most damning" statement by Maldonado, recorded by Garretson on November 7th, 2017 (repeated twice in the Order and several times during trial) illustrates:

> Yeah, **what I am doing** is having him [probably meaning Glover] buy a go-phone down there and **Jeff is buying a go-phone so they can communicate and then throw them away.** And **we** are going to over-night his phone to Vegas and **Jeff** is gonna text pictures every once in a while back to the staff so that way his phone registers in Vegas. As long as he don't get caught red-handed, I think, I think **we** got this. But if they bust him red-handed, **me** and **Jeff** are just, **we** got our story down to where **we** fired the motherfucker and he just went off the deep end.

Order at 21, 62 (Garretson recording of Maldonado) (emphasis added).

To be sure, this was Maldonado parroting and vocalizing ideas for Maldonado "and Jeff" (and perhaps others, *including Garretson himself*) regarding contemplated acts. But notice how this contemplation of plans strayed materially from the details that were later alleged by federal prosecutors. There is no evidence that Maldonado had Glover "buy a go-phone." Nor was there any evidence that "Jeff [Lowe]" bought one. And although there was trial testimony about "over-night[ing]" a phone to Vegas, the affidavit of Lauren Lowe recanted her trial testimony about receiving such a phone in the mail. (And certainly no phone "register[ed] in Vegas.").

This was recitation of a plan by others; not a plan.

Garretson's withheld recordings establish that the talk about having Ms. Baskin killed was *talk initiated by Garretson himself* (in order to set up Maldonado for prosecution). Maldonado's vocalizations placed himself as having knowledge of the potential "story," but his knowledge was plainly wrong—consistent with receiving information rather than creating information.

A conspiracy requires an agreement by at least two people. When one of two persons merely pretends to agree, the other party, whatever he may believe, is in fact not conspiring with anyone. *Johnson v. Sheriff, Clark County*, 532 P.2d 1037, 1038 (Nev. 1975); *Delaney v. State*, 51 S.W.2d 485 (Tenn. 1932).

We now know from undisclosed, newly discovered evidence that Garretson's government handlers *scolded* Garretson behind the scenes and even tried to alter the narrative that Garretson's recordings had established. "Yeah, they [government handlers] were getting on me about, 'quit using 'us' and 'we,''" Garretson told John Phillips after the trial. "That's what they were scolding me about. 'Quit using 'us' and 'we'.'" The government kept "scolding" Garretson that "It can't be your idea." And Garretson admitted that "they're telling me this over and over again." ECF # 232-9.

But the "idea" had already been established. And it was very much the idea of Garretson (and separately, Lowe). Maldonado's participation in the discussions were along the lines of puffery and braggadocio, in line with impressing the company around him. *Cf, Logan v. District of Columbia*, 447 F. Supp. 1328, 1330-1331 (D.D.C. 1978) (involving man who applied to be a "hit man" for an undercover operation who falsely confessed to a murder in order to impress the undercover agents who were posing as members of the

Mafia).

**The many Excuses Maldonado used to avoid Garretson's and Lowe's Plots.**

The actual record—in light of the newly discovered evidence—shows Maldonado's constant delay tactics employed to give *excuses for not participating* in the ideas of Lowe, Glover, and Garretson. Even after many weeks, when Garretson impatiently asked: "You gonna ever send that guy today or is he ever gonna go down there or you just gotta wait for money?" Maldonado responded like always: "I'm figuring that money'll come in today. Then he's gone." But the money never came in, and Glover was never "sent." (Glover finally left Oklahoma around November 25 after Jeff Lowe directed Maldonado to loan him $3,000 from Lowe's Park funds.) Although Maldonado cavalierly askED "Mark" how much a "hit" would cost, his price negotiation was delay and evasion.

Privately, after trial, Garretson admitted that "none of this makes sense if [Maldonado] was really trying to get Carole killed." ECF #232-9. "Maldonado kept delaying with claims of needing money; but Maldonado had plenty of money sources if needed." "It was always about money but Joe could've gotten money from Shirley at any point."

Again, these new revelations *are consistent with Maldonado's trial testimony*. Maldonado testified that he repeatedly used the excuse of 'needing to sell a cub' for money to dodge Garretson's constant murderous conversations.

Maldonado's remarks about buying go-phones (that were never bought) pale in comparison to the very real, developmental, strategic planning strategy and overt acts by Garretson: suggesting the use of fake ID, *selecting the place* for getting the fake ID, *modifying* the fake ID to make it believable, *providing an actual "hit man"* for hire, vouching for the "hit man" and extolling the hit man's capabilities.

These plans were the plans of Garretson:

GARRETSON: Yeah. Just whenever **we** get our head above water you know, **we'll go down and take . . .**

MALDONADO: Tell ya what… GARRETSON: **He'll go take care of her.**

MALDONADO: You really think **you** can trust him? GARRETSON: Oh fucking 100%.

MALDONADO: **That one of Jeff's** run off with my money and never heard from him again.

Recording of March 3, 2018, cited at Order p. 63 (emphasis added).

Again, *it was Garretson* telling Maldonado of Garretson's plan to "go down and take care of her" "whenever we get our head above water." Maldonado merely asked if Garretson thought **he** (Garretson) could trust **his** (Garretson's) new hit man. And the other 'hit man' (Glover) was "one of Jeff's."

Some of what the District Court described as "damning" and "overwhelming, powerful evidence of his guilt" (Order, 59-60) was self-evidently comedic, in line with Maldonado's viral entertainment personality (e.g., "The last guy went to North Carolina and drank it all"). Order, 62.

And <u>every recorded</u> discussion about killing Carole Baskin recorded the discussion *being initiated* by Garretson; not Maldonado:

> GARRETSON: **So I didn't know if <u>we</u> wanted to pursue with the Baskin shit**.
>
> MALDONADO: …[inaudible]… He said he'd take care of Florida for 10 .
>
> MALDONADO: [again]: How well <u>you</u> trust that guy?
>
> GARRETSON: **<u>I've</u> done some shit with him. He's not like that other dipshit, he's . . .**

Order at 63 (emphasis added).

Garretson's affidavit provides even more of the back story: "I introduced the undercover agent to Joe Maldonado Passage at the direction of Matthew Bryant and Andrew Farabow for the purpose of creating a crime as all of the information previously gathered concerning any murder plan, was inaccurate." Garretson Affidavit 2. In other words, Garretson needed to transform his murder plan into Maldonado's plan.

## VI. THE NEW EVIDENCE SUPPORTS MALDONADO'S ENTRAPMENT AND ENTRAPMENT DEFENSES.

A valid entrapment defense has two related elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal conduct. *Mathews v. United States*, 485 U.S. 58, 63 (1988). Maldonado was a pillar of the community who transformed Wynnewood, Oklahoma into a global mecca for tiger research and protection. And although

Maldonado was (falsely) convicted in this case of "taking" endangered species, Maldonado had in fact brought more endangered species into the world than anyone in history.

Maldonado certainly expressed hostility toward Carole Baskin. But he was not predisposed to harming her. Here it was evident that the government was excessively involved in the creation of the crimes of which Maldonado was convicted. See also United States v. Kelly, 748 F.2d 691, 698 (D.C. Cir. 1984) (inducement shown where government's behavior was such that "a law-abiding citizen's will to obey the law could have been overborne."

Most significantly, the newly discovered evidence proves that Maldonado's case was orchestrated by others; with government as conductor. Revelations that persons other than a defendant committed (or participated in) the defendant's crimes are well settled bases for reversal of convictions. *See, e.g., United States v. Boyd*, 55 F.3d 239 (7th Cir. 1995) (upholding granting of new trial where government failed to reveal full scope of criminality of others and favors provided to witnesses by prosecution); *United States v. Minsky*, 963 F.2d 870 (6th Cir. 1992) (reversed where government failed to disclose third party's involvement in criminal scheme and witness's false depiction of events to FBI); *Schledwitz v. United States*, 169 F.3d 1003 (6th Cir. 1999) (reversal where government failed to disclose that its key witness was involved in investigating the defendant,

interviewed potential witnesses, and actively and intimately involved in the investigation).

## CONCLUSION

Maldonado's Motion for New Trial provided newly discovered evidence that discredited almost all of the key witnesses testimony against him. This new evidence shows that his 2019 trial in the Western District of Oklahoma was filled with false and misleading evidence and testimony. Key witnesses gave false testimony regarding every allegation against Maldonado.

Maldonado is plainly entitled to a new trial under every test. Without the false testimony of government witnesses such as Alan Glover, James Garretson, Matthew Bryant, Lauren Lowe, JoAnna Green, Maldonado would not have been convicted at trial. Now the most important accusers have all retracted their trial testimony.

. Moreover, now that unlawfully-withheld recordings have become known, the recordings corroborate Maldonado's defenses rather than supporting the government's allegations.

ACCORDINGLY, Appellant prays for an order reversing the District Court's denial of his motion for new trial, and any other remedy deemed appropriate by this Court.

Dated:  October 3, 2024              Respectfully Submitted,

<div style="margin-left:3em">

By: */s/ Roger Roots*
Roger Roots
John Pierce Law, P.C.
113 Lake Drive East
Livingston, MT 59047
(406) 222-4965  Cell:  (775) 764-9347
rroots@johnpiercelaw.com
*Counsel for Petitioner Joseph Maldonado*

</div>

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation because it contains 12,885 words, excluding the parts exempted by Fed. R. App. P. 32(a)(7)(B)(iii) and Cir. R. 32(a)(1), of the permissible 13,000 words. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the typeface style requirements of Fed. R. App. P. 32(a)(6) because the brief was prepared in 14-point Times New Roman font using Microsoft Word.

Dated: October 3, 2024                */s/  Roger Roots*
                                   Roger Roots

**CERTIFICATE OF SERVICE**

I hereby certify, pursuant to Fed. R. App. P. 25(c) and Cir. R. 25(c), that on

October 3, 2024, the foregoing was electronically filed with the Clerk of the Court

using the CM/ECF system, which will send a notification to the attorneys of record

in this matter who are registered with the Court's CM/ECF system.

Dated: October 3, 2024                    */s/  Roger Roots*

                                          Roger Roots